## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

HELEN MARIE SHREVE,

        *Plaintiff*,

*v.*

COMMISSIONER OF SOCIAL SECURITY,

        *Defendant.*

_____/

CIVIL ACTION NO. 17-cv-13672

DISTRICT JUDGE SEAN F. COX

MAGISTRATE JUDGE PATRICIA T. MORRIS

## REPORT AND RECOMMENDATION ON CROSS-MOTIONS FOR SUMMARY JUDGMENT
(Docs. 16, 17)

## I. RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment, (Doc. 16), be **DENIED**, the Commissioner's Motion for Summary Judgment, (Doc. 17), be **GRANTED**, and this case be **AFFIRMED**.

## II. REPORT

### A. Introduction and Procedural History

This is an action for judicial review of a final decision by the Commissioner of Social Security denying Plaintiff Helen Marie Shreve's claim for Disability Insurance Benefits (DIB) under Title II, 42 U.S.C. § 401 *et seq.* (Doc. 1). Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred

to the undersigned Magistrate Judge. (Doc. 3). Currently before the Court are Plaintiff's and Defendant's cross-motions for summary judgment (Docs. 16, 17). Plaintiff has also filed a reply to Defendant's motion. (Doc. 18).

Plaintiff had filed two prior applications for DIB, the first of which she filed on October 5, 2011, alleging disability beginning April 7, 2010. (Page ID # 118). The claim was denied initially on January 4, 2012; after an administrative hearing, Administrative Law Judge (ALJ) John A. Ransom found she had not been under a disability from her alleged onset date through February 21, 2013, the date of the decision. (Page ID # 118-125). The Appeals Council denied her request for review. (Page ID # 129). She went on to file a second DIB application on April 15, 2014, which was denied on June 16, 2014. (Page ID # 133-142). Plaintiff did not seek to reopen those prior applications int his case, and the ALJ found no basis for reopening them. (Page ID # 45).

Plaintiff filed the application for DIB at issue here on September 12, 2014,[1] alleging onset on March 10, 2010. (Page ID # 251-252). Her claim was denied at the initial level on November 21, 2014. (Page ID # 155-156). After an administrative hearing was held at Plaintiff's request, (Page ID # 64-96), ALJ Margaret O'Donnell issued a decision finding that Plaintiff had not been under a disability from her alleged onset date through the date

---

[1] The ALJ states that Plaintiff filed her DIB application on September 11, 2014. (Page ID # 45). Plaintiff voices no concern over this mistake, and I see no evidence that harm resulted, when the ALJ found Plaintiff not disabled after considering the entire period between the alleged onset date of March 10, 2010, and the date of the decision, October 21, 2016. (Page ID # 58).

of the decision, October 21, 2016. (Page ID # 59-63). The Appeals Council denied Plaintiff's request for review. (Page ID # 777-782). This action followed. (Doc. 1).

### B.  Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F App'x. 502, 506 (6th Cir. 2014) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.*

## C. Framework for Disability Determinations

Under the Act, "DIB and SSI are available only for those who have a 'disability.'"

*Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).   The

Commissioner's regulations provide that disability is to be determined through the

application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled. . . .
>
> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled. . . .
>
> (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled. . . .
>
> (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled. . . .
>
> (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other

4

> work. If you can make an adjustment to other work, we will
> find that you are not disabled. If you cannot make an
> adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528,

534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the

existence and severity of limitations caused by [him or] her impairments and the fact that

[he or] she is precluded from performing her past relevant work." *Jones v. Comm'r of Soc.*

*Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). A claimant must establish a medically

determinable physical or mental impairment (expected to last at least twelve months or

result in death) that rendered him or her unable to engage in substantial gainful activity. 42

U.S.C. § 423(d)(1)(A). The burden transfers to the Commissioner if the analysis reaches

the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc.*

*Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to

show that "other jobs in significant numbers exist in the national economy that [the

claimant] could perform given [his or] her RFC [residual functional capacity] and

considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§

416.920(a)(4)(v), (g)).

### D. ALJ Findings

Following the five-step sequential analysis, the ALJ found Plaintiff had not been

under a disability from the alleged onset date of March 10, 2010, through the date of the

decision, October 21, 2016. (Page ID # 45-63). At step one, the ALJ found that Plaintiff

had not engaged in substantial gainful activity since February 21, 2013. (Page ID # 48).

Next, she determined Plaintiff had the following severe impairments: fibromyalgia;

rheumatoid arthritis (RA) without RA factor; bilateral hand and knee joint pain related to the fibromyalgia and/or RA; sacroilitis; and obesity. (Page ID # 48). Additionally, she had as non-severe impairments hypertension, Hashimoto's status-post total thyroidectomy, and diabetes. (*Id.*). She did not, however, have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment. (Page ID # 49). Before proceeding further, the ALJ found Plaintiff had the residual functional capacity (RFC) to perform light work as defined in 20 C.F.R 404.1567(b), except that she

> is only able to stand and/or walk 4 of 8 hours; should never climb ladders, ropes or scaffolds; can only occasionally crawl, squat, kneel or climb stairs; can never use air or vibrating tools and there should be no production use of the upper extremities; and can only occasionally handle finger or feel with the upper extremities.

(R. 49). At steps four and five, she concluded Plaintiff was unable to perform any of her relevant past work, but that jobs that she could perform existed in significant numbers in the national economy—specifically, light work as a counter clerk (600 jobs in Michigan, 16,500 jobs nationally) or sedentary work as surveillance system monitor (429 jobs in Michigan, 10,000 jobs nationally). (Page ID # 56-57). Thus, the ALJ determined that Plaintiff had not been under a disability as defined in the Social Security Act during the relevant time period. (Page ID # 58).

### E. Administrative Record

#### 1. Medical Evidence

The Court has reviewed Plaintiff's medical record. In lieu of summarizing her medical history here, the Court will make references and provide citations to the record as necessary in its discussion of the parties' arguments.

6

### 2.  Application Reports and Administrative Hearing

### i.  Plaintiff's Function Report

Plaintiff completed a function report on October 4, 2014. (Page ID # 300). At the time, she lived in a house with family. (*Id.*). She explained that her pain kept her from working, affected her concentration, and troubled her sleep, leaving her tired. (*Id.*). Her knee and back made it difficult to stand, and at times to walk. (*Id.*). Her hands were "stiff, tingly, painful, and often times swollen," which made it "hard to grab, hold or carry the simplest objects." (*Id.*). For example, she sometimes needed help to open a soda or milk. (*Id.*). Additionally, her shoulder and elbow sometimes affected her ability to lift or carry— for example, she had dropped a gallon of milk (*Id.*). "I find it difficult to do so many things that are everyday activities . . . we take for granted. Lifting, sitting, standing, even holding a pencil for long [periods] of time is impossible." (*Id.*).

On an average day, she would "[t]ake medication, let [the] dog out, take shower, dress, have breakfast (usually cereal), laundry, dishes, sweep floor, tidy up house, [and] make [a] small dinner." (Page ID # 294). She often took a break during or between tasks, and a nap if needed. (*Id.*). She could not push and pull a vacuum cleaner, and carrying a full laundry basket was "too much" for her shoulder. (Page ID # 296).

Personal care was no obstacle, except that she could no longer curl her hair; she remained able to dress, bathe, shave, feed herself, and use the toilet. (Page ID # 294). For meals, Plaintiff's mother often prepared and sent over food, but Plaintiff also cooked a couple times a week. (Page ID # 295). She spent about 15 to 25 minutes preparing foods like eggs, oatmeal, sandwiches, frozen meals, noodles, and vegetables. (*Id.*). Before onset,

Plaintiff had been able to make all her meals and bake, but now she could not stand long enough or stir thick foods, like dough. (*Id.*).

Plaintiff had a daughter, whom she helped by giving rides in the car, but "other than driving she [her daughter] is able to care for herself." (Page ID # 294). Plaintiff's daughter helped her around the house by bathing the dog, carrying the laundry basket, vacuuming, and taking out the trash. (Page ID # 294-295). In addition, her daughter did "almost all outside chores" because Plaintiff found the vibrations from mowing too hard on her hand and shoulder. (Page ID # 296).

Prior to onset, Plaintiff had been able to do home repair, heavy lifting, and all the yard work, as well to stand for a long time, bathe the dog, curl her hair, vacuum, pick up tiny objects, and take out the trash. (Page ID # 294). For fun, Plaintiff used to roller blade, work out, go for long drives, do wood work like building toy boxes and bird houses, and make home repairs. (*Id.*). And she had been "able to be more involve[d] in physical activities with her children" like walks, roller blading, and bike rides. (Page ID # 298).

Now, Plaintiff liked to read, watch television, and spend time with her dog and family every day or every other day. (Page ID # 297). She went to her mother's and her daughter's houses on a regular basis—about two to three times a week—to talk. (*Id.*). She had no problems getting along with others. (Page ID # 298, 299).

Her illnesses, injuries, or conditions affected her ability to lift, squat, bend, stand, reach, walk, kneel, climb stairs, complete tasks, concentrate, and use her hands. (*Id.*). She explained: "I have trouble lifting more than gallon of milk, squatting and bending. [T]rouble with pain in knee, back, standing in grocery store line is sometimes too much,

reaching above head or behind head in restricted with shoulder, walking in store." (*Id.*). Her hands could not "grip small objects well enough to pick up," and when shopping for groceries, she needed to lean on the cart for support. (*Id.*)

She estimated she could walk 50 to 100 feet before needing to stop and rest for a couple of minutes. (*Id.*). Asked how long she could pay attention, Plaintiff responded: "Not an issue," but she also indicated she could not finish a movie because she usually could not sit long enough. (*Id.*). She followed written and spoken instructions "just fine." (*Id.*).

She handled stress "as well as others I guess," though she did not like change. (Page ID # 299). As for "unusual behavior or fears," Plaintiff had fears about "falling and home security, so if I leave my mom's or daughter's I call as soon as I am home so they know I'm ok and house is locked up." (*Id.*).

Plaintiff had used arm braces every day since they were prescribed about four years prior; she also wore glasses. (*Id.*). None of her medications caused side effects. (Page ID # 300).

### ii.  Plaintiff's Testimony at the Hearing

An administrative hearing was held in Plaintiff's case on August 26, 2016, with ALJ Margaret O'Donnell presiding. (Page ID # 64). At the time of the hearing, Plaintiff lived with her 21-year-old daughter and 2-year-old grandson. (Page ID # 69).

Plaintiff had finished high school and was able to read and write in English. (Page ID # 70). She had a driver's license and said she "like[d] to keep [her] independence in trying to drive," though she did not drive often and would usually "just drive to like a local

grocery store or to my mom's and she's about five to seven minutes away from me." (Page ID # 70-71).

Plaintiff had not worked since early 2010. (Page ID # 71). In 2002, she had worked as an import clerk for Odessa Import Services for over a year, which involved lifting less than ten pounds, mostly sitting, entering data from papers into a computer, faxing, mailing, filing, and handling phone calls. (Page ID # 72). She had also worked for about a month as a "trainee assistant manager" at a dry cleaner, Pro-Clean, but the ALJ decided not to consider that as past work. (Page ID # 72-73).

Additionally, she had worked at General Motors, where she stood and sorted parts; she estimated the heaviest weight she lifted in that job was 10 or 15 pounds. (Page ID # 86). And she had worked as a waitress at a casino, where the heaviest weight she lifted was 5 pounds, and as a waitress at a Red Lobster, where she lifted up to 10 pounds. (Page ID # 86-87).

Lastly, she had also been employed as a van driver, as well as a substitute school custodian, on occasion. (Page ID # 84). As a custodian, she lifted up to 15 pounds. (Page ID # 85). As a van driver, she sometimes had to lift cases of fruit that weighed 20 to 25 pounds. (*Id.*).

Plaintiff explained why she could no longer work: "I have a lot of difficulty with swelling, a lot of swelling in my hands, my feet. I have pain that will generate sometimes at these, all over my body. I've had a few periods of where I have been in so much pain that I've needed help getting out of bed even to use the restroom. Say about three or four times that's occurred. That's occurred over a couple days span when it happens." She also

10

had "trouble standing up" and could not "sit too long in a certain position." (*Id.*). Her hands, feet, back, and right knee were the biggest problems for her. (*Id.*).

Plaintiff explained that she had seen her rheumatologist, Dr. Carrera, six or seven more times since the final entry in the record. (Page ID # 74). He had taken her off the medication for her arthritis in February "because my liver count was too high." (*Id.*). He "continue[d] to take blood work" and had sent her to a specialist for the high liver count, at Flint Gastroenterology Associates, whom she would see in September. (Page ID # 74-75).

Plaintiff testified that she could sit for about thirty minutes to an hour before needing to get up and do stretches or "move a little bit." (Page ID # 77). She could stand for about fifteen minutes, but then her back and knee would bother her. (*Id.*). She could walk, with "a little hobble," and did not use any assistive devices. (*Id.*). She thought she could lift a gallon of milk without problems, but not more, as her back and hands bothered her. (Page ID # 77-78). In fact, she had dropped a gallon of milk a few times. (Page ID # 78). She had trouble grasping "little tiny objects," and could not grip or hold objects for a long period of time. (*Id.*). By Plaintiff's estimate, she could write "just a few minutes" before needing to stop. (Page ID # 81). Her dominant (right) hand was worse than her other. (*Id.*). Due to her knees, her first few steps after standing were "always shaky." (*Id.*). The lower right side of her back hurt the worst, and she also had muscle spasms that went "up to between [her] spine and [her] shoulder blade," and "wrapped around [her] ribs." (Page ID # 81). Further, Plaintiff could reach in front of herself, but could not hold heavy objects overhead

because of her right shoulder. (Page ID # 82). And she had trouble sleeping at night, so she took naps of thirty minutes to an hour several times a day. (Page ID # 83).

Plaintiff did not have any hobbies or social activities, belong to any clubs, attend church, or perform any volunteer activities. (Page ID # 73, 79). On an average day, she began by letting her dog out, using the bathroom, and taking her medication. (Page ID # 79). Then she would "try to sit down and take a break, but, because I have to get up and you know, I'll try to like sweep the floor or fold some laundry." (*Id.*). She could take a shower or a bath, she said, explaining, "I care for myself with no problem." (*Id.*). She would eat "a little snack" for breakfast and then do some dishes, taking breaks if there were too many, as she could not stand for long. (*Id.*). She would call her mother and might visit her. (Page ID # 79-80). Additionally, she attended any medical appointments she had scheduled. (Page ID # 80).

Because she was allergic to most pain medication, she did not take any. (Page ID # 76). Dr. Carrera had taken her off Methotrexate, but it had helped when she was taking it, though she had still "had a lot of pain." (*Id.*). Dr. Shriner had suggested she try medical marijuana for the pain, but she had not yet. (Page ID # 80). She took Metformin and tried to watch what she ate to control her blood sugar. (Page ID # 78-79). The Metformin caused her "a lot of stomach issues," so she often had to "run to the bathroom" unexpectedly. (Page ID # 76-77).

Besides taking medication, she also found some relief by icing her knee, back, and neck, elevating her feet, and lying down. (Page ID # 78). She used an ointment, Pennsaid,

on her hands. (*Id.*). She had had surgery on both hands in 2011 or 2012, as well as thyroid surgery. (Page ID # 74).

### iii.    The Vocational Expert's Testimony at the Hearing

Vocational Expert (VE) Stephanie A. Lorrie also testified. (Page ID # 83). She began by classifying Plaintiff's past work in the last 15 years as a waitress (semi-skilled, light); a composite of janitor (semi-skilled, medium, performed at light) and delivery driver (semi-skilled, medium); waitress-bar (semi-skilled, light); hand packager (unskilled, medium, performed at light); and foreign clerk (skilled, sedentary). (Page ID # 88-91).

The ALJ then posed her first hypothetical:

> [A]ssume please a hypothetical individual who is the same age as this Claimant, also with the same educational background and past work, who is able to perform the demands of light work as defined in our Regulations except with restrictions for occasional crawling, squatting, kneeling and stair climbing; no air or vibrating tools; occasional handling, fingering, gripping and grasping; and no production use of the upper extremities . . . .

(Page ID # 91). The VE replied that the hypothetical person could not perform Plaintiff's past work. (Page ID # 91-92). She would be able to perform other work, such as counter clerk (51,000 jobs nationally); furniture rental clerk (22,000 jobs nationally); and usher (26,000 jobs nationally). (Page ID # 92-93).

The ALJ's second hypothetical further limited standing and walking to four out of eight hours, and restricted feeling with the fingertips to occasional. (Page ID # 93). Plaintiff's past work remained unavailable, and the usher and furniture rental consultant positions would also be eliminated. (*Id.*). A reduced range of counter clerk positions would

13

be available (10,000 jobs nationally, 600 in Michigan). (*Id.*). No other jobs were available at the light exertion level that fit the ALJ's hypothetical. (Page ID # 94).

Additionally, if the hypothetical person had to elevate her feet at waist level or above at intermittent, unexpected times throughout the day, no jobs would be available. (Page ID # 94-95). Nor would any work be available for a person requiring the option to sit, stand, or lay down at intermittent, unexpected times throughout the day. (Page ID # 95). More than one absence per month would generally be work preclusive. (*Id.*).

To conclude, the VE affirmed that her testimony had been consistent with the Dictionary of Occupational Titles, except as to "[i]nformation such as standing and walking," which were based on her personal experience. (*Id.*).

### F. Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into categories: "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006). Both acceptable and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the

14

impairment(s), and physical and mental restrictions." *Id.* When acceptable medical sources issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure her RFC. *Id.* § 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Certain opinions of a treating physician receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); *see also Wilson*, 378 F.3d at 544.[2] The only opinions entitled to dispositive

---

[2] The rules in § 404.1527 apply for claims filed before March 27, 2017, as Plaintiff's was. For claims filed on or after that date, the rules in § 404.1520c apply instead. 20 C.F.R. § 404.1527.

effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2, 1996). Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2, 1996). The ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the person's RFC, or the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to a treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996); *see also Rogers*, 486 F.3d at 242.

For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec'y of Health & Human Servs.*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273 (Table), 1995 WL 138930, at *1 (6th Cir. 1995).

The claimant must provide evidence establishing his or her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as

16

the Secretary may require." 42 U.S.C. § 423(d)(5)(A); *see also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most he [or she] can still do despite his limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2).

In accordance with SSR 16-3p, an ALJ must analyze the consistency of the claimant's statements with the other record evidence, considering his testimony about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in the Social Security Ruling. SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016). This analysis and the conclusions drawn from it—formerly termed a credibility determination[3]—can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

### G. Analysis

Plaintiff argues the ALJ erred by (1) rejecting Plaintiff's description of her limitations caused by her fibromyalgia due to a lack of objective support, and (2) failing to satisfy Step Five's requirement that the Commissioner prove the existence of a "significant number" of jobs she can perform.

Before I turn to Plaintiff's allegations of error, however, I will address the issue of *res judicata* and the Notice of Supplemental Authority filed by Defendant regarding a

---

[3] On March 28, 2016, SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016), superseded and replaced SSR 96-7p. *See* SSR 16-3p, 2016 WL 1237954 (Mar. 24, 2016). The Social Security Administration explained in SSR 16-3p that the ruling's main purpose was to eliminate the term "credibility," and thereby "clarify that subjective symptom evaluation is not an examination of an individual's character." 2016 WL 1119029, at *1 n.1.

recent Sixth Circuit decision, *Earley v. Comm'r of Soc. Sec.*, 893 F.3d 929 (6th Cir. 2018). (Doc. 19).

About twenty years ago, the Sixth Circuit held that the "[w]hen the Commissioner has made a final decision concerning a claimant's entitlement to benefits, the Commissioner is bound by this determination absent changed circumstances." *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837 (1997). The Social Security Administration then issued an Acquiescence Ruling on *Drummond*:

> When adjudicating a subsequent disability claim with an adjudicated period arising under the same title of the Act as the prior claim, adjudicators must adopt such a finding from the final decision by an ALJ or the Appeals Council on the prior claim . . . unless there is new and material evidence relating to such a finding or there has been a change in the law, regulations or ruling affecting the finding or the method for arriving at the finding.

SSAR 98-4(6), 1998 WL 283902 (June 1, 1998).

Recently, however, the Sixth Circuit clarified the meaning of *Drummond*. In *Earley*, a Social Security Administration ALJ had thought *Drummond* precluded him from revisiting an earlier finding that the claimant was not disabled unless she offered new and material evidence of a changed condition. *Earley*, 893 F.3d at 931. But "[t]hat is not how it works." *Id.* at 932. Rather, the Sixth Circuit explained, "[a]n individual may file a second application—for a new period of time—for all manner of reasons and obtain independent review of it so long as the claimant presents evidence of a change in condition or satisfies a new regulatory condition." *Id.*

Courts applying *Earley* to litigation that arose before that case have asked whether the ALJ, despite following *Drummond*, gave the new evidence a fresh look. If so, then the

ALJ's decision satisfied the mandates of *Earley*; if not, then remand was appropriate. *See Dugan v. Comm'r of Soc. Sec.*, __ F. App'x __, 2018 WL 2769401 (6th Cir. 2018) (post-*Earley* Sixth Circuit decision finding ALJ pre-*Earley* appropriately considered administrative *res judicata* where she ultimately found new and material evidence of medical improvement meant she was not bound by a prior ALJ's determination); *Brent v. Comm'r of Soc. Sec.*, No. 17-12654, 2018 WL 4403418, at *2–3 (E.D. Mich. Sept. 17, 2018) (overruling objection and adopting R&R affirming Commissioner where ALJ had issued decision pre-*Earley* but still conducted an independent review of the evidence and did not simply adopt prior ALJ's findings wholesale); *Kimball v. Comm'r of Soc. Sec.*, No. 17-12659, 2018 WL 4102845, at *5 n. 4 (E.D. Mich. Aug. 7, 2018) (finding *Earley* did not change its analysis of pre-*Earley* ALJ decision because ALJ had concluded she was not bound by the previous RFC due to new and material evidence), *Rep. & Rec. adopted*, 2018 WL 4095081 (Aug. 28, 2016). *Cf. Seabolt v. Berryhill*, No. 3:17-CV-470, 2018 WL 3545382, at *3 at n. 4 (N.D. Ind. July 23, 2016) (finding that "*Earley* had not been decided when the ALJ opined on Seabolt's case and therefore does not control this Court's analysis of the ALJ's decision").

Here, the ALJ recognized in her opinion that *Drummond* was at the time the current case law in the circuit, and that therefore the prior finding on Plaintiff's RFC would be binding absent evidence of an improvement or change in condition since the prior hearing. (Page ID # 50). But the ALJ went on to find a change in condition: "new severe impairments of fibromyalgia, rheumatoid arthritis without RA factor, sacroiliitis, and obesity." (*Id.*). Thus, she did not adopt the prior findings, but instead took a "fresh look"

19

at the entirety of the record. (*Id.*). I suggest that satisfies the mandates of *Earley*, and agree with the parties that *res judicata* did not bar the imposition of a more restrictive RFC than in the prior decision. *See* (Doc. 16 at Page ID # 818); (Doc. 17 at Page ID # 833-835).

Neither party mentions that the ALJ *did* consider herself bound by the prior finding that Plaintiff was unable to return to her past relevant work, pursuant to *Dennard v. Sec'y of Health & Human Servs.*, 907 F.2s 598 (6th Cir. 1990). (Page ID # 56). I suggest that any error is harmless, however, because the ALJ found Plaintiff to have a *more* restrictive RFC than in the prior decision; it follows that Plaintiff could not be capable of her past relevant work now if she had not been with a *less* restrictive RFC. In addition, the VE testified at the most recent hearing that someone with Plaintiff's (more recent, more restrictive) RFC could not perform any of her past relevant work.[4] I maintain, therefore, that *Earley* does not require remand in this case.

---

[4]Although neither party alleges error on this ground, I note that the final RFC assigned to Plaintiff differed slightly from the hypotheticals posed at the administrative hearing: The ALJ omitted the hypotheticals' restriction to only occasional gripping or grasping, and she imposed an additional limitation that Plaintiff may never climb ropes, ladders, or scaffolds.

I suggest that the omission of the limitation to occasional gripping or grasping is harmless, as both seem to be a type of "handling," *see* SSR 85-15, 1985 WL 56857, at *2, and the final RFC did restrict Plaintiff to occasional handling. Further, the DOT entries for the positions named in Step Five include occasional handling but no mention of "gripping" or "grasping." *See* Dictionary of Occupational Titles, 249.366-010; *id.* at 379.367-010.

The imposition of the additional limitation that Plaintiff may never climb ropes, ladders, or scaffolds, on the other hand, means the ultimate RFC was more restrictive— and thus more favorable to Plaintiff—than any of the hypotheticals posed to the VE at the hearing. While the ALJ should have included all the restrictions, in this case I suggest the error is harmless because the DOT descriptions for the positions identified in Step Five do not require any climbing. *See* Counter Clerk, Dictionary of Occupational Titles, 249.366-010; Surveillance System Monitor, Dictionary of Occupational Titles, 379.367-010.

### 1. Plaintiff's Fibromyalgia

I now turn to Plaintiff's first allegation of error, which is based on the ALJ's treatment of her fibromyalgia. Though the ALJ did find Plaintiff's fibromyalgia to be both a medically determinable impairment and severe, (Page ID # 48), Plaintiff accuses the ALJ of then using the "lack of objective support" to discredit Plaintiff's subjective complaints about the severity of her fibromyalgia. (Doc. 16 at Page ID # 820-821). This reliance upon objective signs of severity "ignores the very nature of fibromyalgia," according to Plaintiff. (*Id.*).

The Social Security Ruling on the evaluation of fibromyalgia describes it as "a complex medical condition characterized primarily by widespread pain in the joints, muscles, tendons, or nearby soft tissues that has persisted for at least 3 months." SSR 12-2p, 2012 WL 3104869, at *2. The Sixth Circuit has recognized that "unlike medical conditions that can be confirmed by objective testing, fibromyalgia patients present no objectively alarming signs." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243-44 (6th Cir. 2007). For example, people with fibromyalgia "manifest normal muscle strength and

---

Further, the ALJ *did* include the limitation on climbing ropes, ladders, and scaffolds in her later vocational interrogatory to the VE, in response to which the VE confirmed that the position of surveillance system monitor would be available. (Page ID # 339-340). Remanding for reconsideration would thus likely be an exercise in futility, as a restriction on climbing would not eliminate either position, and the findings at Step Five would be unchanged. *See Ferrell v. Comm'r of Soc. Sec.*, No. 1:14-cv-1232, 2016 WL 316724, at *7 (W.D. Mich. Jan. 27, 2016) (ALJ's failure to include all credible limitations in hypothetical was harmless error where DOT descriptions for jobs identified by VE demonstrate that limitations would not have eliminated positions). I suggest any error is harmless.

neurological reactions and have a full range of motion." *Preston v. Sec'y of Health & Human Servs.*, 854 F.2d 815, 820 (6th Cir. 1988).

Still, as Defendant points out, a diagnosis of fibromyalgia alone is insufficient to prove disability. *See Vance v. Comm'r of Soc. Sec.*, 260 F. App'x 801, 806 (6th Cir. 2008) ("[A] *diagnosis* of fibromyalgia does not automatically entitle [the claimant] to disability benefits . . . .") (emphasis in original). "As with any claim for disability benefits," the Commissioner still "must ensure there is sufficient objective evidence to support a finding that the person's impairment(s) so limits the functional abilities that it precludes him or her from performing any substantial gainful activity." SSR 12-2p, 2012 WL 3104869, at *2.

Due to the nature of fibromyalgia, objective testing may be "of little aid or relevance" in determining the existence or severity of fibromyalgia. *Preston*, 854 F.2d at 820. SSR 12-2P explains that the ALJ should then follow SSR 96-7p's two-step credibility analysis to evaluate the claimant's personal statements about the severity of her own symptoms.[5] At the first step, the ALJ looks for medical signs and findings that show the person has a medically determinable impairment that "could reasonably be expected to produce the pain or symptoms alleged. *Id.* At the second step, where "objective medical

---

[5] Although the Commissioner has rescinded SSR 96-7p and eliminated the term "credibility" from Administration policy, SSR 16-3p, 2016 WL 1119029, at *1 (Mar. 16, 2016), the underlying regulation remains materially unchanged, *see* 20 C.F.R. § 404.1529(c), and I agree with the courts in this district that have continued to apply SSR 96-7p to cases arising prior to its rescission. *See, e.g., Cooper v. Comm'r of Soc. Sec.*, No. 16-cv-13477, 2017 WL 3923984, at *3 (E.D. Mich. August 21, 2017), *Rep. & Rec. adopted by* 2017 WL 3891971 (E.D. Mich. Sept. 9, 2017); *Tuttle v. Comm'r of Soc. Sec.*, No. 16-11144, 2017 WL 2928021, at *6 n. 3 (E.D. Mich. June 9, 2017), *Rep. & Rec. adopted by* 2017 WL 2905125 (E.D. Mich. July 7, 2017).

evidence does not substantiate the claimant's statements about the intensity, persistence, and functionally limiting effects of [her] symptoms," the ALJ should then consider "all of the evidence in the case record," including activities of daily living, medications and treatments, the nature and frequency of the claimant's attempts to obtain medical treatment, and so on. SSR 12-2p, 2012 WL 3104869, at *5 (July 25, 2012).

Though the ALJ did not demarcate steps one and two in her analysis, she completed both. First, she found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms. (Page ID # 53). At the second step, however, the ALJ found Plaintiff's statements about the intensity, persistence, and limiting effects of her symptoms, "not entirely consistent with the medical evidence and other evidence in the record." (*Id.*).

The ALJ then went on to consider exactly the kind of evidence contemplated by SSR 12-2p. She noted, for example, that Plaintiff had reported improvement with medication—Gralise "was working pretty good for her knees, and other joints as well" in December 2013; Celebrex was working, and Plaintiff was "still hurting, but better" in August 2014; and Methotrexate "moderately controlled" her symptoms as of April 2016. (Page ID # 53) (citing Page ID # 410, 759). The ALJ recounted Plaintiff's self-reported activities of daily living and noted that she was able to take care of herself independently. (Page ID # 50-51). She pointed out that medical records from November 2015 and April 2016 stated Plaintiff was able to perform activities of daily living and even was able to

23

work, and was not "frustrated, depressed, or anxious" about her conditions.[6] (Page ID # 53-54) (citing Page ID # 681, 759). And she made note of (as Defendant puts it) "examination findings that supported Plaintiff's reports of pain while also demonstrating fewer functional restrictions than she alleged," (Doc. 17 at page ID # 837)—for example, when Plaintiff reported pain on palpation at multiple tender points, but was able to sit comfortably on the examination table without difficulty or evidence of pain, (Page ID # 771).

Plaintiff takes particular issue with the ALJ's discussion about her normal clinical examinations and imaging scans that "do reveal findings that could support complaints of pain, . . . [but] do not support the degree of subjective complaints that the claimant is alleging." (Doc. 16 at Page ID # 820) (citing Page ID # 53). The ALJ's exploration of Plaintiff's clinical examinations and imaging scans is not specifically about the severity of Plaintiff's fibromyalgia, however; rather, is a more general response to Plaintiff's overarching allegation that she is disabled. *See* (Page ID # 53-54). The ALJ found Plaintiff had multiple medically determinable impairments besides fibromyalgia—namely, RA without RA factor; bilateral hand and knee joint pain related to the fibromyalgia and/or RA; sacroilitis; and obesity—most of which, unlike fibromyalgia, *are* susceptible to objective testing. (Page ID # 48). Thus, it is unclear whether this part of the analysis supports Plaintiff's contention that the ALJ discredited Plaintiff's complaints about her

---

[6] At the hearing, however, Plaintiff testified that she had not been able to work and had not been working at that time. There is no evidence in the record that she was employed in April 2016.

fibromyalgia based on a lack of objective testing. Further, as explained above, the ALJ did not discount Plaintiff's credibility about the severity of her condition solely on the basis of objective evidence (or the lack thereof).

Ultimately, determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Courts give "great weight and deference" to an ALJ's evaluation of a claimant's subjective statements—generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011); *Daniels v. Comm'r of Soc. Sec.*, 152 F. App'x 485, 488–89 (6th Cir. 2005); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 392–93 (6th Cir. 2004). I suggest Plaintiff has not presented a sufficient reason here.

Nor has Plaintiff explained how her RFC was inadequate to account for her fibromyalgia, as is her burden. *Thomas v. Comm'r of Soc. Sec.*, No. 15-13291, 2017 WL 927623, at *7 (E.D. Mich. Feb. 17, 2017) ("Plaintiff has the burden of demonstrating that his RFC is insufficiently restrictive.") (citing *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994)); *Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 423 (6th Cir. 2008)).

For all the above reasons, I suggest that the ALJ did not err in analyzing the severity of Plaintiff's fibromyalgia.

## 2.  The ALJ's Step Five Analysis

Next, Plaintiff asserts that substantial evidence does not support the ALJ's Step Five conclusion that jobs she can perform exist in significant numbers. (Doc. 16 at Page

25

ID # 822). Whether jobs exist in significant numbers is a question of fact subject to the substantial evidence standard. *See Taskila v. Comm'r of Soc. Sec.*, 819 F.3d 902, 905–06 (6th Cir. 2016).

At Step Five in the disability determination process, the burden is on the Commissioner to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)). The Act makes clear that "[i]t does not matter" if the work exists in the immediate area the in which the claimant lives. 20 C.F.R. § 404.1566(a)(1). Work "exists in the national economy when it exists in significant numbers either in the region where [the claimant] live[s] or in several other regions of the country." *Id.* at § 404.1566(a). There is no "magic number"; at bottom, judges must be guided by their common sense. *Hall v. Bowen*, 837 F.2d 272, 275 (6th Cir. 1988). Additionally, the Sixth Circuit has offered some examples of criteria that judges might consider at Step Five: the level of the claimant's disability, the reliability of the VE's testimony, the reliability of the claimant's testimony, the distance the claimant is capable of travelling to engage in the assigned work; the isolated nature of the jobs; and the types and availability of the work. *Id.*

In this case, at Plaintiff's administrative hearing, the ALJ crafted an RFC limited to light work with additional restrictions: standing and walking four out of eight hours per day; occasional crawling, squatting, kneeling, and stair climbing; occasional handling, fingering, gripping, grasping, and feeling with the fingertips (bilaterally); no air or

26

vibrating tools; and no production use of the upper extremities.[7] (Page ID # 91-93). The VE identified a single job that plaintiff could perform with that RFC: counter attendant, with 600 positions in Michigan and 10,000 in the national economy. (Page ID # 93-94). After the hearing, the ALJ sent the VE a vocational interrogatory asking whether Plaintiff could perform any sedentary work with that RFC. (Page ID # 335-337). The VE again replied with just one position: surveillance system monitor, with 429 jobs in Michigan and 16,500 in the national economy; the two positions together made for a total of 1,029 jobs in Michigan and 26,500 in the national economy. (Page ID # 339-340).

There is no "magic number" of jobs the Commissioner must name to carry its burden at Step Five. A relatively recent Sixth Circuit case, however, may prove instructive: In *Taskila*, the VE testified the plaintiff could do at least two jobs—callout operator and system surveillance monitor—which together accounted for 200 jobs in Michigan and 6,000 nationwide. *Taskila*, 819 F.3d at 904. The Court there remarked that 6,000 jobs nationwide "fits comfortably within what this court and others have deemed 'significant.'" (*Id.* at 905) (citing *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 579 (6th Cir. 2009) (2,000 jobs); *Liskowitz v. Astrue*, 559 F.3d 736, 743 (collecting cases to conclude "it appears to be well-established that 1,000 jobs is a significant number"); *Jenkins v. Bowen*, 861 F.2d 1083 (8th Cir. 1988) (500 jobs); *Barker v. Sec'y of Health & Human Servs.*, 882 F.2d 1474, 1479 (9th Cir. 1989) (1,266 jobs)). Plaintiff does not attempt to explain why, although 200 jobs in Michigan and 6,000 jobs nationwide were significant in *Taskila*, 1,029

---

[7] In the end, Plaintiff's RFC was identical to this hypothetical except for the differences discussed *supra*, which I suggest have no effect on the outcome of this case.

jobs in Michigan and 26,500 in the national economy are not in her case. (Page ID 339-340).

As a final matter, Plaintiff argues that "consideration of the factors from *Hall* should have taken place, especially when the ALJ was relying on testimony that plaintiff was able to perform only a *single job.*" [8] (Doc. 16 at Page ID # 823) (emphasis in original). First, I note that *Hall* imposed no requirement that any judge explicitly consider all—or even any—of the factors it outlined. *Hall*, 837 F.2d at 275. *Hall* itself did not analyze any of them. *Id.*; *see also Harmon v. Apfel*, 168 F.3d 289, 292 (6th Cir. 1999) (understanding *Hall* factors to be "suggestions only"). And anyway, in this case the ALJ did discuss at least three of the suggested factors: the level of the claimant's disability (Page ID # 48-56); the reliability of the claimant's testimony, (Page ID # 53); and the types and availability of the work Plaintiff could perform, (Page ID # 56-58).

For all the above reasons, I suggest Defendant has carried its burden at Step Five, and remand on this basis is unwarranted.

---

[8] Plaintiff goes on to acknowledge that the VE named a second available work position, surveillance system monitor, by vocational interrogatory. (Doc. 16 at Page ID # 823). Though she does not explicitly argue it was error for the VE to name only one position at the hearing, Plaintiff repeatedly emphasizes that fact. But ALJs may "cite fewer than three occupations when it is clear that jobs exist in significant numbers within fewer than three occupation(s)." POMS § DI 25025.030. *See also* 20 C.F.R. §§ 404.1566(b); 416.966(b). I suggest that is the case here.

### H. Conclusion

For the reasons stated above, the Court **RECOMMENDS** that Plaintiff's Motion for Summary Judgment, (Doc. 16), be **DENIED**, the Commissioner's Motion for Summary Judgment, (Doc. 17), be **GRANTED**, and this case be **AFFIRMED**.

## III.   REVIEW

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ.

P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  December 19, 2018                    S/ PATRICIA T. MORRIS
                                           Patricia T. Morris
                                           United States Magistrate Judge


### CERTIFICATION

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: December 19, 2018                     By s/Kristen Castaneda
                                           Case Manager